The Appellant and Defendant in the Trial Court, Warnell Reid. Again, the Court appreciates both lawyers being willing to reschedule at our request, and we are grateful for your services under the Criminal Justice Act. Mr. Shelton. It's my pleasure, Your Honor. May it please the Court, Mr. Riley. Judge, I think we bring two relatively straightforward issues for the Court's consideration. One's a search issue and one's a sentencing issue under the residual cause of the ACCA. I'll address the search issue first, Your Honor. As this Court's aware, there was an arrest of Ernestine Graham in October. And Ernestine Graham, at her residence, the testimony was that they went to arrest her on a supervisory lease revocation warrant. And when they went to the residence, the deputy marshals and the detectives involved in the operation testified that they arrested Ms. Graham at her doorway or outside of the home. At the time of her arrest— They knocked. Is this correct? They knocked, and then she came out voluntarily and left the door open. Yes, Your Honor. The record from the suppression hearing and from the trial indicate that she was either at the doorway or outside of the home. And I think all of the record is consistent that she was ultimately arrested on the porch of the residence. And after her arrest, there's some conflicting evidence, but I believe that both of which support our position that the initial seizure of the weapon in the bedroom was illegal. And thus, the fruits from that search should also be excluded from this case. At the trial, as the government points out in their brief, Deputy Marshal McDaniel testified that Ms. Graham called out for her children, and they all came to the front porch and to the area where their arrests were. Detective Kimball testifies that when they went into the residence, the kids were corralled in the living room. Is this a trial or suppression? Detective Kimball, Your Honor, was at the suppression hearing, and Deputy Marshal was at the trial. If there's no renewal of the motion at trial, we have to rule on the basis of the suppression record, don't we? Well, I do believe on the record that we did renew our objections at the trial. To the suppression ruling? Yes, Your Honor. I do believe the record's clear on that. But nevertheless, I think that we win even if we do rely on the transcript from the suppression hearing. The reality of the situation was, as Detective Kimball clearly testified, was that she accompanied Ms. Graham into the bedroom after a protective sweep had been conducted. And the term protective sweep was used throughout the testimony at the suppression hearing. Magistrate Nose, in his ruling, his report and recommendation, I should say, that was ultimately adopted by District Court Judge Hamilton. He says, well, no, this wasn't a protective sweep because there wasn't a basis for conducting a protective sweep. And without addressing that issue, what I would say was, he said, but it's okay because of two exigencies. And those exigencies were the presence of minor children and the fact that Ms. Graham was in her pajamas and that they intended to take her into the home to allow her to get dressed. What's wrong with the clothing? Well, the problem with both are really, judges, it's a matter of timing. I mean, the fact of the matter is that- What about inevitable discovery? Well, I think the answer to the inevitable discovery is I think this circuit's law requires that for inevitable discovery to apply, there has to be evidence that there was the pursuit of a substantial alternate line of investigation. I'm familiar with that requirement. My point is, judges, that- Because they were already planning to take her in for the clothes would be the argument. Yeah, and I think what we have to do is then we have to, if you want to rely on the exigency of the clothes, that that was going to happen, the way that it was executed is inconsistent. Judge Noe says that a law enforcement official is allowed to remain with the defendant as they escort him into the room. I mean, clearly at this point, that never happened. They never made it to the room prior to the weapon being located. And so Mrs. Graham, I mean, setting aside that there's no evidence that I'm aware of that she requested to have the opportunity to change her clothes, but setting that aside, they had already went in, they had already located the weapon, they had already started their questioning. She didn't have the opportunity to direct them to where she had clothing. She may well have had clothing in another room or resided in another room, but the fact of the matter is they were already in the room where the weapon was found. But that's necessarily part of the inevitable discovery. That's a backdrop to the rule. Again, Judge, I'm not aware of the application of inevitable discovery in this circumstance. I wasn't able to find any precedent that supported that allowing someone to potentially change their clothes qualifies as an alternate line of investigation. I mean, I don't think – What about her consent to the search later? Well, I think the consent, again, was fouled by the – Tainted, you said? Tainted by the search. I mean, the weapon was located, Judge. In short, I'm going to have a limited time. I'm going to use it here to try to address both issues. But what I would say is timing is everything. And we have a situation here where I believe these exigencies were defeated by the illegal protective sweep. And while we can try to contort the timeline to say that these exigencies support that, I don't believe that's a fair way to – What about, is there a theory about officer safety when she's going into her house? Right, and I can address that. First of all, again, I think in order for us to address the protective sweep, as Judge Knost accurately stated, there wasn't any threat of any kind of attack from the immediate area of where they were. The testimony in the trial is they went through to an open door in the kitchen and through another short hallway into the bedroom. So ultimately – How did the police know that? I'm sorry, Your Honor. How did the police know that that was the situation when they went in? Well, I'm not saying that they didn't know that, but when they're on the porch, they have an opportunity to view their surroundings and make a decision as to whether they can conduct a protective sweep. They extended that sweep far beyond the parameters of what I believe would be a justifiable sweep. And again, that's what Judge Knost has already ruled. Real quick, if I may, Your Honor, I do want to shift gears to this residual clause issue. And I'll just try to state what we're saying. We believe that the James case, the Supreme Court invited the circuit courts to examine the state's interpretation of attempted burglary convictions to determine if they constitute the commission of an offense that is categorically a violent felony and thus falls under the residual clause. We believe, and Judge Loken, it was your opinion, we believe that the court took the Supreme Court up on that invitation in the Smith case. And in the Smith case, as obviously we're aware and hopefully it's reflected in our brief, the court found that the attempted burglary that they analyzed there was a violent felony. However, what I'd like to focus on in Distinguished Smith would be is the examination and the analysis the court went through to get there in the Minnesota case. And what we attempted to do is to point out that this court in Smith, at least it's our belief, held that this attempted burglary was still a crime of violence under the ACCA's residual clause. However, it reached that conclusion based upon its review of Minnesota's interpretation of its attempted burglary statute. And I feel that this court satisfied itself that that was okay. So in your last minute, 45, what about the Missouri statute? Why doesn't it qualify? We believe that, so again, I would make the point that the Minnesota statute, the court found that categorically the appellate courts in the state of Minnesota required the proof that a defendant had to have entered a building, attempted to, or entered a building. And we don't believe that protection is available under Missouri's second degree burglary statute. We don't believe that safeguard is present. And we tried to point out in the case that we cited for the court, the Bush case of just one such example where a defendant was charged under attempted second degree burglary for something for conduct that would not fall under the residual clause. Judge, I would conclude by saying, your honors, I should say, I will conclude by saying we believe both of these arguments are reason for this court to remand this case. We don't believe that, as the court's aware, Mr. Reed received a 15 year sentence for this conviction. And it was predicated upon the attempted second degree burglary conviction that he got in 1984. That would be the first thing. And we also think that, I want to make the point clear, I think we do in our brief though, but the discovery of that gun that was initially found on the initial search, however you want to characterize it, we believe that's tainted and that, under the fruit of the poisonous tree doctrine, eliminates the ability for any of the three weapons that were discovered in the home to be used. Thank you, judges. Thank you, Mr. Shelp. Mr. Riley. Thank you, your honor. May it please the court. Mr. Shelp, I'm Mike Riley. I represented the United States at trial in this case. I became involved in the case after the motion hearing but before the trial. With regard to the first issue, perhaps it may not be a traditional buoy sweep, but it is an exigent circumstances sweep that was necessitated by the circumstances in this case. The reality of the matter was that in late November in St. Louis, the marshals were exercising a caretaking function over the situation that they came across. And essentially the marshals arrived and contacted Ms. Graham, who was wanted by the district court for a supervised release violation. One thing I'd ask the court to keep in mind is you weigh the circumstances of the case. At that point, Warren L. Reed was not even a blip on the radar. They didn't know who he was. There's no suggestion or evidence that anything here was pretextual. So when the marshals get to the scene, essentially what the evidence is, is that Ms. Graham has just gotten out of bed and she's in her pajamas. And the evidence is even more clear if the court were to consider the trial record under Williams at 6-16, F-3rd, 7-60. The record's even more clear that she was roused out of bed. One of her 10-year-old children woke her up and told her there was a swap team. She also testified that she opened the door, which is one reason it cracked slightly when the marshals knocked on the door. So having said that, what the marshals are confronted with is a woman who's standing in her living room. They ask her to step out, and she's either placed in handcuffs at the doorway or on the porch, but she complies. She steps out, and she says she's got minor children in the house. And another thing that Ms. Graham explained was that the children came running out of the residence. So we have a fluid situation. Children are running out of the residence, and the marshals are preparing to enter. But basically, they've been handed a situation that they're going to have to deal with. And these are the exigencies created by the circumstances of the arrest where they encounter Ms. Graham, and they're going to have to look after her because she's only partially clothed and her children. And I'd ask the court to consider carefully the cases that we've cited, in particular Gwen, Debus, DiStefano, and Loudermilk. And it was reasonable to take the children back into the residence and Ms. Graham. And when the officers or the marshals were going to do that, they certainly had to be in a position to provide for the safety of everybody in the residence. And one of the deputy marshals testified to that as well. And Judge . . . Why does that justify searching the whole house? Why can't they just put the kids in the main room inside the front door and take her into the room where she can get dressed, and that's it? Well, Judge, in this case, I want to touch on the inevitable discovery argument. I think under the exigencies of the situation . . . I'll take that as a there is no. Well, go ahead. Well, and one point that I want to make unequivocally is part of her arrest was to provide for her safety, and that meant she needed clothes, she needed shoes. I think it's fair for the court to infer that since she had just gotten out of bed . . . And there you assert without citation that the clothes exigency authorized a sweep before taking her in the room, and that issue was expressly ducked and abused. And so you've got to give me some authority for the notion that because they're going to take her in this bedroom where there are guns in plain view, they have to sweep it first. Well, Judge, there's . . . When there's no threat of danger that's known, objectively reasonable threat of danger present. Well, the marshals are making a felony arrest, Your Honor. They're making a felony arrest in an unfamiliar environment. Of a nonviolent nature. When they take her back and she's violated her supervised release . . . Just give me the cite that's not in the brief. Okay, Judge. On an issue that you just give the back of your hand to and that we thought was serious enough that we expressly didn't address it and abuse. Well, we don't want to give it the back of our hand to, Your Honor. They did sweep the residence. I don't dispute that. No, not the residence. The bedroom. The bedroom. I've gone to the second exigence. They did sweep the bedroom. They did sweep the bedroom, which is very near the living room where they were going to put the children and where they were going to put Ms. Graham. And unequivocally, they were going to take Ms. Graham into the bedroom as part of the arrest to get her clothes and shoes to provide for her safety. I'm waiting for the cite. Well, Your Honor, I don't have a specific cite for you. I'm not going to . . . I don't have a specific cite, but under the exigencies of this circumstance, Your Honor, the exigencies of the case . . . But, I mean, you know, if you . . . Then we proceed to the normal justifications, standards, Supreme Court standards for protective sweeps. And there has to be an objectively reasonable perception of danger in a . . . as small an area as is reasonable. And it's . . . Well, were her clothes in the bedroom? Her clothes were in the bedroom, Your Honor. That's . . . They could have taken her in there, yeah. And they did take her in there. And maybe it is an inevitable discovery case. The record is in there. We would certainly argue to the court that this is an inevitable discovery case as well. It wasn't in the brief, was it? It wasn't in the brief, Your Honor, no. Is there a finding that she asked to go in and get dressed? No, there's not, Your Honor. Well, what about that? I can't tell you. Can the police just say, we think you should get dressed as a way to check out the bedroom? No, Your Honor. And I think that's a great question. And if you analyze Gwynne and Butler, those are two cases that are in our brief, where I believe the court's analysis was that it was not necessarily material that . . . whether or not the defendant asked to be brought back into the room to get dressed or not, because that was in support of the caretaking function that the arresting officers had to provide for the safety . . . So you think it's reasonable under the Fourth Amendment, even if she doesn't ask, for the officers to bring her in to get dressed? Based on my reading of Gwynne and Butler, and I believe Gwynne cites a Supreme Court case . . . perhaps Washington v. Chrisman, and there's also Katie v. Dombrowski . . . that talk about a community caretaking rationale. So, yes, I do believe it's reasonable to take her in, whether or not she asked. It's late November in St. Louis. There's evidence in the record to support that it was cold out at the time, including the defendant's own testimony. It's in the third transcript, where the defendant testified that he bought clothes, jacket-type clothes. Well, I think D'Abuse is direct support for this part of the inquiry. Because we say that, you know, a partially clothed status may constitute an exigency. The arresting officer has authority to maintain custody over the arrestee and to remain literally at the arrestee's elbow at all times, quoting Chrisman. Yes, Your Honor. End of that case. And then we go on. We thus need not evaluate the government's contention, made here again, that the protective sweep was lawful before the accompanying . . . I'm sorry, we thus . . . Before accompanying, staying at the elbow of the arrestee, so to speak. Yes, Your Honor. And, again, they were going to accompany her into that room no matter what, and she was going to have to go to that room no matter what to change her clothes. That was going to happen as part of the arrest and apprehension of Ms. Graham, which is what this investigation was related to. And, again, I cite and argue that there's no pretext in this case. This was to take care of Ms. Graham, and it was to take care of her children. That was their purpose, and to provide for the safety of everybody who was present. Also, for the record, one thing I'd like the court to factually willy-love and endorse, Polk were not discovered in the upstairs bedroom until after the rifle was located. And then the police essentially had to determine who they were. The record supports that. I'd like to hear what you have to say about the sentencing issue. Yes, Your Honor. Because under Missouri law, if a substantial step is sufficient to constitute an attempt, and if reconnoitering is a substantial step under the Missouri law, then query whether James and Smith apply here. Judge, my position is James and Smith do apply here. Missouri does apply the substantial step doctrine. They do require that the attempt have with it a substantial step, which is strongly corroborative of the actor's purpose. But does that include mere preparation like reconnoitering? Judge, I haven't found a case where the Missouri courts, in our analysis of the law, we have not found a case where the Missouri courts have accepted that. I'd direct the court to, Your Honor. How about the statute itself and the notes to comment to the statute? The notes and the comment on the statute do, I read them briefly, Your Honor. I believe they may support reconnoitering. So if we conclude that is sufficient for a violation, then where does that leave the court? I guess my suggestion to the court, Your Honor, is a jury would have to find that and a court would have to find it sufficient. And I haven't found that in any of the cases that we've analyzed. Lee, which is a case that we cited, was an attempt burglary first degree. And I know it's a burglary first rather than a burglary second. But the evidence of intent that the court considered as strongly corroborative was an attempt to enter the residence by pulling the door, kicking the door. I'm sure there are cases factually where the person did attempt to enter. But the problem is whether the elements allow a conviction for just casing the residence. And if we conclude that it does, then isn't James distinguishable? I believe the notes on use said that the entire set of circumstances also need to be considered, Your Honor. And that's where I'd ask you to step back and look at James again for a moment. At 204, the proper inquiry is whether the conduct encompassed by the elements of the offense in the ordinary case presents a serious potential risk. And when you get to that, we're back to your analysis. The same risk as completed burglary, basically. The same risk, maybe more, based on James because of the prospect of intervention, which causes it to be an attempt in most cases rather than a completed burglary. So I'm back to the court's analysis and Smith, Your Honor. And what I'd submit to the court is when you analyze the Missouri statutes and the ordinary case, not the unusual case, and that the ACCA does not require a metaphysical certainty in terms of potential risk, also language in James. Well, that's not yet. I'm sorry, Your Honor. They change it every time they take it up. Thank you, Your Honor. I see that amount of time. Thank you for your time. Very good. Ms. Schell? His time had expired, Your Honor. You presented the issues very well. I think they're before us to the extent they should be. So we'll take it under advisement again.